```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -:
MARK INESTI,                            : 13 Civ. 6351 (WHP) (JCF)
                                        :
          Petitioner,                   :      REPORT AND
                                        :      RECOMMENDATION
     - against -                        :
                                        :
PEOPLE OF THE STATE OF NEW YORK,        :
                                        :
          Respondent.                   :
- - - - - - - - - - - - - - - - - - - -:
```
TO THE HONORABLE WILLIAM H. PAULEY, U.S.D.J.:

Mark Inesti was convicted after a bench trial of two counts of robbery in the first degree, one count of robbery in the second degree, two counts of assault in the second degree, and one count of criminal possession of a weapon in the third degree. The trial judge sentenced him as a persistent violent felony offender to a term of 20 years to life in prison. His conviction and his sentence were affirmed on appeal. Now proceeding pro se, he petitions for a writ of habeas corpus. I recommend that the petition be denied.

Background

Mr. Inesti's prosecution arose out of an incident in the summer of 2008 in which he admittedly absconded with some clothes he took from an outdoor bin of a department store on 173rd Street in Manhattan.

At trial, an assistant manager of the El Mundo department store and three law enforcement officers involved in apprehending Mr. Inesti testified for the prosecution. According to assistant manager Wayne Roberts, Mr. Inesti was on the sidewalk outside the El Mundo department store among outdoor tables and bins containing

1

store merchandise when he placed an item in a large bag he was carrying and began walking away. (1/7/10 Tr. at 17-18, 20-22, 24).[1]  After Mr. Roberts haled him, Mr. Inesti took off running. (1/7/10 Tr. at 22-24). Mr. Roberts and a coworker gave chase; when they closed in on the petitioner, he dropped the bag he was carrying. (1/7/10 Tr. at 25-27). As Mr. Roberts attempted to retrieve the bag, Mr. Inesti turned around, unsheathed a gravity knife, and advanced toward Mr. Roberts, saying, "Come on. Come on." (1/7/10 Tr. at 26-29, 139). Mr. Roberts backed away, and the petitioner again fled, turning into an alley. (1/7/10 Tr. at 29-30).

Mr. Roberts reported the incident and described the suspect to a plain-clothes police officer who happened to be nearby. (1/7/20 Tr. at 33, 131). The officer and a colleague pursued Mr. Inesti down the alley. (1/7/10 Tr. at 35, 131-32). Meanwhile, Mr. Roberts, his store manager (who had since arrived on the scene), and two different officers -- Lieutenant Richard Duggan and Lieutenant Gerald Pizzano, both of whom were assisting in executing a search warrant in a nearby building -- canvassed the neighborhood in a car for the petitioner. (1/7/10 Tr. at 35, 75, 77-78, 106, 108-10).

---

[1] The court reporters did not paginate the transcript of the trial consecutively. Instead, the first day of the trial, January 7, 2010, is paginated separately from the transcript of the next two trial days, January 11 and 12, 2010, which are paginated separately from the final day of the trial, January 14, 2010. I cite the transcript of the first day of trial as "1/7/10 Tr."; the second and third days of trial as "1/11/10 Tr."; and the fourth as "1/14/10 Tr." The transcript of the sentencing is designated "S. Tr."

When Mr. Roberts identified the petitioner on the sidewalk, Lieutenant Duggan got out of the car and chased him on foot. (1/7/10 Tr. at 38-39, 82-83, 111-12). Mr. Inesti collided with a boy on a bicycle but continued running. (1/7/10 Tr. at 82-84, 112, 114). The petitioner again dropped the bag and darted between two parked cars. (1/7/10 Tr. at 84, 86-87). Lieutenant Duggan grabbed Mr. Inesti and their momentum caused them to crash onto the hood of a parked minivan, shattering the windshield. (1/7/10 Tr. at 86-87, 114). The petitioner slipped away, and Lieutenant Duggan cut his hand on the broken glass as he pushed himself up from the hood of the minivan. (1/7/10 Tr. at 88, 116-17). Lieutenant Duggan again caught up with Mr. Inesti and shoved him, causing him to bang into another parked car, at which point Lieutenant Pizzano, now on foot, was able to tackle him. (1/7/10 Tr. at 88, 114-15). Another officer involved in the chase, Detective Pedro Alfonso, arrested Mr. Inesti. (1/7/10 Tr. at 89, 117, 128, 134-35). Detective Alfonso recovered the clothing from the bag and the gravity knife from Mr. Inesti's pocket. (1/7/10 Tr. at 136, 138).

Mr. Inesti's defense was two-fold. He argued that, "by virtue of mental disability," he "fail[ed] to formulate the necessary intent to commit" some of the crimes with which he was charged, and that, "by reason of mental disease or defect, [he] lack[ed] substantial capacity . . . to appreciate or know the nature and consequences of his actions." (1/7/10 Tr. at 5; 1/11/10 Tr. at 130-33). Factually, Mr. Inesti's account of the relevant events, to the extent that he remembered them, differed slightly from the

3

prosecution's. He testified that he was outside El Mundo on his way to have his hair braided when he began to hear threatening voices. (1/11/10 Tr. at 39, 74). In order to disguise himself from those who were threatening him, he took off his shirt and put it into a bag that he had picked up, and began behaving as if he worked at the store, folding and stacking the clothes in the outdoor bins. (1/11/10 Tr. at 39-40, 44, 76-77). When he noticed someone running to get a gun from under a car, he panicked, putting a stack of clothes that he was folding inside the bag. (1/11/10 Tr. at 40, 45-47, 78-79). He gave the money that was in his pocket to someone, saw an array of lights, which he identified as demons, coming after him, and pulled out his knife. (1/11/10 Tr. at 40, 79-80). To ward off the spirits, he practiced a ritual he had learned in prison, making the sign of the cross with the knife while reciting the beginning of the Lord's Prayer. (1/11/10 Tr. at 33-34, 40-42, 47, 53-54). And he ran. (1/11/10 Tr. at 41-42). He testified that he did not remember anything else until he woke up in the hospital. (1/11/10 Tr. at 42, 57).

Mr. Inesti also testified about his difficulties in school, drug use (both legal and illegal), and mental health problems. (1/11/10 Tr. at 32-36). While he was in prison in the 1990s, he began to take psychiatric medications. (1/11/10 Tr. at 36). Also while he was in prison, he was stabbed nine times and subsequently began practicing certain protection ceremonies involving a pocket knife, which he used instead of a (cost-prohibitive) ceremonial sterling silver dagger. (1/11/10 Tr. at 33-34, 79, 83). His

mental health problems intensified after September 11, 2001. (1/11/10 Tr. at 33). He was no longer incarcerated at the time, and he believed that people were trying to kill him to take possession of the house that he had inherited from his mother. (1/11/10 Tr. at 34-35, 37, 68).

Forensic psychologist Marc Janoson, Ph.D., testified that he administered a psychological test known as the MMPI-2 in order to evaluate Mr. Inesti's "mental disease or defect" defense, and specifically to determine whether Mr. Inesti was malingering, as previous doctors had found. (1/11/10 Tr. at 105, 113, 127-28, 152, 198-202). Although the company that scored the test "invalidated the profile" because Mr. Inesti "made so many atypical and rarely given responses" (1/11/10 Tr. at 114-15), Dr. Janoson nonetheless examined three validity scales -- variable response inconsistency, true response inconsistency, and infrequency psychopathology responses -- determined them to be acceptable or borderline acceptable, and interpreted the test. (1/11/10 Tr. at 116-17). He asserted that Mr. Inesti presented "an exaggerated profile," but also "a paranoid schizophrenic profile." (1/11/10 Tr. at 118, 120). He further "hypothesi[zed]" that Mr. Inesti was "severely mentally ill at the time of the incident" and did not understand the nature and consequences of his actions, finally concluding that the petitioner was not guilty by reason of mental disease or defect. (1/11/10 Tr. at 123, 221).

In rebuttal, over the defense's relevance objection, the prosecution played recordings of seven phone calls that Mr. Inesti

made between March and August 2009, while he was incarcerated at Rikers Island. (1/11/10 Tr. at 223-24). In summation, the prosecution argued that, unlike his "halting," "flat," and "rambl[ing]" trial testimony, his manner on the phone calls was "witty," "expressive," and engaging, and therefore provided evidence of malingering.[2] (1/14/10 Tr. at 33-34).

The judge rejected Mr. Inesti's mental illness defenses as not credible and found him guilty of six of seven counts, acquitting him only of second degree assault against the boy on the bike. (1/14/10 Tr. at 50; S. Tr. at 14). At sentencing, Mr. Inesti admitted that he had two prior violent felony convictions for attempted robbery in the second degree, and he was therefore sentenced as a persistent violent felony offender.[3] (S. Tr. at 2-3, 5).

Mr. Inesti appealed his conviction and sentence, contending that (1) the recorded phone calls were erroneously admitted; (2) the evidence was insufficient to establish the element of physical injury required to sustain the second degree robbery and second degree assault convictions; (3) the evidence was insufficient to

---

[2] The content of these recordings is not in the trial transcript. However, the brief the State submitted in Mr. Inesti's appeal includes transcriptions of portions of the recordings. (State Court Record, attached as Appendix to Declaration of Priscilla Steward dated Jan. 15, 2014, at 109-12).

[3] The two prior crimes to which he admitted were committed in 1992 and 1996. (S. Tr. at 2-5). Because periods during which he was incarcerated were excluded for the purpose of determining whether the prior convictions occurred within 10 years of the date of the commission of the crimes at issue here, N.Y. Penal Law §§ 70.04(1)(b)(iv), (v), 70.08(1)(b), both convictions counted for purposes of persistent violent felony offender status.

establish the element of a threat with a dangerous weapon required to sustain the first degree robbery conviction; (4) the three robbery convictions were against the weight of the evidence, which failed to establish that Mr. Inesti had formed the necessary intent; and (5) the sentence was unconstitutional because it was based on factual findings made by a judge rather than a jury. (State Court Record at 12-13). The Appellate Division affirmed the conviction and sentence, holding (1) the challenges to the sufficiency of the evidence were not preserved; (2) even if they were preserved, the convictions were based on legally sufficient evidence; (3) the convictions were not against the weight of the evidence; (4) the recordings of the phone calls were properly admitted as rebuttal evidence; and (5) Mr. Inesti's sentence as a persistent violent felony offender was not constitutionally infirm. People v. Inesti, 95 A.D.3d 690, 691-92, 944 N.Y.S.2d 148, 149 (1st Dep't 2012).

Mr. Inesti then petitioned the New York Court of Appeals for leave to appeal, arguing that the Appellate Division's approval of the admission of the phone call recordings impermissibly "broadened the standard for introducing rebuttal evidence to disprove a psychiatric defense." (State Court Record at 159, 162). The Court of Appeals denied leave. People v. Inesti, 19 N.Y.3d 1026, 953 N.Y.S.2d 559 (2012).

In his petition, Mr. Inesti raises each of the claims that he argued to the Appellate Division except for the one on which he sought leave to appeal -- the claim that the recordings of the

telephone calls were erroneously admitted. (Petition at 6-10).

Discussion

A habeas petitioner must exhaust all available state remedies for each claim prior to federal review. 28 U.S.C. § 2254(b)(1)(A); Duckworth v. Serrano, 454 U.S. 1, 3 (1981). For a claim to be exhausted, a petitioner must utilize "all available mechanisms to secure appellate review of the denial of that claim." Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981). That requires that the petitioner have "invok[ed] one complete round of the State's established appellate review process." Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal quotation marks omitted). To properly exhaust a claim in New York, the petitioner must first "fairly present[]" it to the Appellate Division, and then "must seek further review . . . by applying to the Court of Appeals for a certificate granting leave to appeal." Id. at 73-74 (emphasis omitted) (internal quotation marks omitted). "In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and legal premises of the claim he asserts in federal court." Daye v. Attorney General of the State of New York, 696 F.2d 186, 191 (2d Cir. 1982). If a petitioner "at some point . . . had th[e] right [to raise a claim before the state's highest court] but failed to exercise it," the claim will be deemed exhausted but procedurally defaulted because the petitioner "no longer possess[es] the right under the law of the State to raise . . . the question presented." Galdamez, 394 F.3d at 74 (internal quotation marks omitted); see

also Richardson v. Superintendent of Mid-Orange Correctional Facility, 621 F.3d 196, 201 (2d Cir. 2010) ("When a petitioner can no longer present his unexhausted claim of trial error to the state courts, we deem the claim procedurally barred." (internal quotation marks omitted)). The merits of a procedurally defaulted claim may not be reviewed by a federal court unless the petitioner shows cause for the default and actual prejudice resulting from it, or that failure to consider the defaulted claim would result in a "fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 749-50 (1991).

Each of the claims Mr. Inesti raises in his petition is procedurally defaulted. The Second Circuit has held that where an appellant, in his application for leave to appeal to the New York Court of Appeals, presses fewer than all of the claims that he presented to the Appellate Division, a federal court should "assume that the Court of Appeals would construe [the leave application] as abandoning" those omitted claims. Galdamez, 394 F.3d at 74. The outcome is the same "[e]ven if the original Appellate Division briefs are submitted along with the leave application," because "New York's highest court has no duty to look for a needle in a paper haystack." Smith v. Duncan, 411 F.3d 340, 345 (2d Cir. 2005) (internal quotation marks omitted).

Here, counsel for Mr. Inesti sent the Appellate Division briefs along with a letter seeking leave to appeal and "request[ing] the opportunity to file a supplemental letter with the judge to whom this matter is assigned, addressing in greater

9

detail the reasons why the Court should review [the] case and how the issues are preserved for . . . review." (State Court Record at 152-53). Approximately one month later, counsel submitted the supplemental letter, which argued only the rebuttal evidence issue. (State Court Record at 159-62). In these circumstances, it is appropriate to assume that the Court of Appeals construed the application as abandoning all claims other than that one. See Galdamez, 394 F.3d at 74. New York allows only one application for direct review, so the petitioner can no longer raise these claims in the ordinary appellate process; moreover, because Mr. Inesti did not raise before the Court of Appeals the claims he now presses, he "may not seek collateral relief in New York courts." Spence v. Superintendent, Great Meadow Correctional Facility, 219 F.3d 162, 170 (2d Cir. 2000). Therefore, his claims are procedurally defaulted. Id.

As noted above, the merits of a procedurally-defaulted claim may not be reviewed by a federal court unless the petitioner either shows cause for the default and actual prejudice resulting from it, or shows that failure to consider the defaulted claim would result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 749-50. To show cause and prejudice the petitioner must identify the "cause for the default and prejudice from a violation of federal law." Martinez v. Ryan, __ U.S. __, __, 132 S. Ct. 1309, 1316 (2012). The petitioner has not identified any reason that would have prevented him from raising these claims to the Court of Appeals.

Establishing a fundamental miscarriage of justice sufficient to excuse a procedural default requires a showing of actual innocence. See Murray v. Carrier, 477 U.S. 478, 496 (1986). In his reply submission, Mr. Inesti states that his claims "should not be barred because [the petition] deals with factual innocence." (Petitioner Mark Inesti Responds to Respondent's Answer dated Jan. 15, 2014 ("Reply") at 7). However, "[t]o be credible, such a claim requires petitioner to support his allegations of [actual innocence] with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). Mr. Inesti has submitted no such evidence. Accordingly, this Court cannot reach the merits of the claims.

Also in his reply submission, Mr. Inesti raises a raft of new claims. Some of them -- for example, his complaints that his mental illness is not being treated during his incarceration (Reply at 2) -- are not proper subjects for a habeas petition, although they might be cognizable as claims under 42 U.S.C. § 1983. There are, however, two additional claims that might be appropriate for resolution on a petition for a writ of habeas corpus: the contention that the trial court erroneously admitted the recorded phone calls and the argument that he was deprived of his right to trial by jury. (Reply at 3-7).

A court will not generally address issues raised for the first time in a reply brief. Evangelista v. Ashcroft, 359 F.3d 145, 155

n.4 (2d Cir. 2004); Holquin v. Lee, No. 13 Civ. 1492, 2013 WL 3344070, at *1 n.2 (S.D.N.Y. July 3, 2013) (refusing to address issues raised for first time in pro se habeas petitioner's reply brief, except to the extent that the arguments responded to arguments in respondent's opposition). In any case, these claims fail for the same reason as Mr. Inesti's other four do.

It is obvious that the claim regarding Mr. Inesti's right to a jury trial is procedurally defaulted as it was not raised at all before the state courts. Mr. Inesti did raise the issue regarding admission of the recorded phone calls before both levels of the state appellate courts. But he did not argue a federal constitutional claim before those courts. See Daye, 696 F.2d at 191 ("In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and legal premises of the claim he asserts in federal court."). To be sure, a petitioner need not cite "book and verse on the federal constitution" to alert a state court to the nature of a legal claim; it is sufficient that the legal claim argued is substantially equivalent to a constitutional claim. Picard v. Connor, 404 U.S. 270, 278 (1971) (internal quotation marks omitted). However, a state court should not have to guess that a constitutional claim is involved. Petrucelli v. Coombe, 735 F.2d 684, 689 (2d Cir. 1984). A petitioner may fairly apprise the state court that he is raising a federal constitutional claim by:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so

> particular as to call to mind a specific right protected by the Constitution, [or] (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye, 696 F.2d at 194. That was not done here. The application to the Court of Appeals cited only state court cases, each of which addressed the proper scope of rebuttal evidence under New York law. See People v. Harris, 57 N.Y.2d 335, 344-46, 456 N.Y.S.2d 694, 697-98 (1982); People v. Santarelli, 49 N.Y.2d 241, 248-49, 425 N.Y.S.2d 77, 80-81 (1980); People v. Schicchi, 13 A.D.3d 470, 470-71, 787 N.Y.S.2d 338, 339 (2d Dep't 2004); People v. Gabriel, 241 A.D.2d 835, 836-38, 661 N.Y.S.2d 306, 308-09 (3d Dep't 1997). There was no argument, either explicit or implicit, that the trial court's asserted error of state evidentiary law deprived Mr. Inesti of his right to a fair trial. See Freeman v. Kadien, 684 F.3d 30, 35 (2d Cir. 2012) (noting that error of state evidentiary law violates federal constitution only if it deprives petitioner of "due process right to a fundamentally fair trial" (internal quotation marks omitted)). Therefore, no constitutional claim was fairly presented to the state courts, and the rebuttal evidence claim, too, is procedurally defaulted.

Conclusion

    For these reasons, I recommend denying the petition. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the

Honorable William H. Pauley, Room 1920, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:   New York, New York
         April 23, 2014

Copies mailed this date:

Mark Inesti
No. 10 A 1169
Attica Correctional Facility
P.O. Box 149
Attica, NY 14011

Priscilla Steward, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271